1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11   ANTOINE L. ARDDS, | Case No.  1:18-cv-01324-JLT-BAM (PC) |
| 12                    Plaintiff, | FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| 13          v. | |
| 14   HICKS, *et al.*, | (ECF No. 92) |
| 15                    Defendants. | **FOURTEEN (14) DAY DEADLINE** |

16

## I.      Introduction

Plaintiff Antoine L. Ardds ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.  This action proceeds on Plaintiff's second amended complaint against Defendants Hicks, Amaya, Alcantar, McIntyre, Baylon, and Sanchez ("Defendants") for failure to protect Plaintiff from an alleged assault by Inmate Hall on November 9, 2017, in violation of the Eighth Amendment.

This case has a long procedural history, which the Court will not fully repeat here. Relevant to the instant motion, Defendants previously filed a motion for summary judgment based on Plaintiff's failure to exhaust administrative remedies.  (ECF No. 69.)  The motion was granted in part and denied in part, and the case proceeds only "against any Defendants who may have been members of the ICC and IDTT committees on November 2, 2017 or November 3, 2017."  (ECF No. 81, p. 19; adopted in full by ECF No. 87.)  The Court noted that to the extent

1   the remaining Defendants "were not members of those committees on the dates in question, the

2   parties [would] have the opportunity to present further evidence of that fact in a later motion for

3   summary judgment. (*Id.*)

4       Currently before the Court is Defendants' motion for summary judgment, filed July 18,

5   2022.[1]  (ECF No. 92.)  On July 25, 2022, Plaintiff filed a document, which the Court construed as

6   a motion to file an amended complaint, attempting to add additional defendants who participated

7   on the relevant ICC or IDTT committees.  (ECF No. 93.)  As Plaintiff had not attached a

8   proposed amended complaint or otherwise explained why leave to amend should be granted at

9   this late stage, the Court denied the motion, without prejudice to re-filing.  (ECF No. 94.)

10  Plaintiff thereafter filed an opposition to the motion for summary judgment on August 11, 2022.

11  (ECF No. 95.)  Defendants filed a reply on August 17, 2022.  (ECF No. 96.)  Plaintiff filed a

12  "Propos[ed] Reply in Opposition to Defendants' Reply to Opposition of Their Summary

13  Judgment and Propos[ed] Stipulation," which the Court construes as a proposed sur-reply, on

14  September 1, 2022.  (ECF No. 97.)  Plaintiff did not re-file his motion to amend or a proposed

15  amended complaint.

16      Defendants' motion for summary judgment is now fully briefed.  Local Rule 230(l).  For

17  the reasons set forth below, the Court recommends that Defendants' motion for summary

18  judgment be granted.

19  **II.      Plaintiff's Proposed Sur-reply**

20      Generally, parties do not have the right to file sur-replies, and motions are deemed

21  submitted when the time to reply has expired.  Local Rule 230(l).  The Court generally views

22  motions for leave to file sur-replies with disfavor.  *Hill v. England*, No. CVF05869 REC TAG,

23  2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing *Fedrick v. Mercedes–Benz USA, LLC*, 366 F.

24  Supp. 2d 1190, 1197 (N.D. Ga. 2005)).  However, district courts have the discretion to either

25  permit or preclude a sur-reply.  *See U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195,

26  1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable

27  ────────────────────
    [1] Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing a motion for
28  summary judgment.  (ECF No. 92-1.); *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d
    952, 957 (9th Cir. 1988); *Klingele v. Eikenberry*, 849 F.2d 409, 411–12 (9th Cir. 1988).

surreply"); *JG v. Douglas County School Dist.*, 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in denying leave to file sur-reply where it did not consider new evidence in reply); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond).  In this Circuit, courts are required to afford *pro se* litigants additional leniency.  *E.g., Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012); *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *Silva v. Di Vittorio*, 658 F.3d 1090, 1101 (9th Cir. 2011); *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

Here, Plaintiff did not seek leave of Court before filing his sur-reply.  However, in light of Defendants' apparent non-opposition and Plaintiff's *pro se* status, the Court will exercise its discretion to not strike the evidence.  The Court will consider the evidence presented.

## III.    Legal Standard

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323).  In contrast, if the nonmoving party will

have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id.

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

///

///

///

4

**IV.     Discussion**

      **A.     Undisputed Material Facts ("UMF")**[2]

      <u>CDCR Policy Regarding Inmate Housing</u>

      1.     At all times relevant to the allegations in the Second Amended Complaint and during the original filing of this action, Plaintiff was—and still is—a state inmate in the custody of the California Department of Corrections and Rehabilitation.  (ECF No. 1; ECF No. 32 (Second Am. Compl. (SAC)) ¶ 5.)

      2.     Title 15 of the California Code of Regulations and CDCR's Operations Manuel (DOM) contain specific policies regarding Integrated Housing of inmates.  (ECF No. 92-4 (Sanchez Decl.) ¶ 6, Ex. A.)

      3.     All inmate housing assignments are made on the basis of available information, individual case factors, as well as correctional experience and training, correctional awareness, and a sense of correctional reasonableness.  (*Id.* ¶ 7, Ex. A.)

      4.     Individual case factors include, but are not limited to, history of racial violence, commitment offense, sentence, classification score, custody level, education, and disciplinary history.  (*Id.*)

      5.     CDCR uses Integrated Housing Codes (IHC) to reflect the inmates' eligibility to be racially integrated in a housing environment.  (*Id.*)

      6.     Inmates may be eligible for housing with all races, with only certain races, or with only their own race based on individual case factors.  (*Id.* ¶ 8, Ex. A.)

      7.     An inmate who can house with members of any race receives a Racially Eligible (RE) IHC designation.  (*Id.*)

///

---

[2] *See* Defendants' Separate Statement of Undisputed Material Facts.  (ECF No. 92-2.)  Plaintiff did not comply with the rules in preparing his opposition, including by failing to provide "a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support" of any disputed facts.  Local Rule 260(b).  As a result, Defendants' Separate Statement of Undisputed Material Facts is accepted except where brought into dispute by Plaintiff's opposition, separate statement of undisputed facts, and declaration in support of his opposition, all signed under penalty of perjury.  *See Johnson v. Meltzer*, 134 F.3d 1393, 1399–1400 (9th Cir. 1998).  Unless otherwise indicated, disputed and immaterial facts are omitted from this statement and relevant objections are overruled.

8.      The departmental expectation is that all inmates are coded RE, unless certain case factors dictate otherwise.  (*Id.*)

9.      Inmates are not entitled to single-cell assignment, housing location of choice, or cellmates of their choice.  (*Id.* ¶ 9, Ex. A.)

10.      The departmental expectation is that all inmates will double-cell (*i.e.*: inmates will have cellmates).  (*Id.* ¶ 8, Ex. A.)

11.      At California State Prison-Corcoran (COR), new arrivals are processed through Receiving and Release (R&R).  (*Id.* ¶ 10.)

12.      R&R is where inmates are received at the prison, or released and transferred to other institutions.  (*Id.*)

13.      Generally, an incoming inmate's first few hours at COR are marked by the intake process and waiting for assignment to permanent cells, if any are available.  (*Id.*)

14.      During that time, inmates are also screened for medical and mental health concerns.  (*Id.*)

15.      Typically, R&R sergeants conduct an Initial Housing Review that includes an interview with the inmate and a review of his prison records, and are responsible for determining an inmate's Integrated Housing eligibility.  (*Id.* ¶ 11.)

16.      An inmate's history of in-cell assaults or violence is just one of the factors that sergeants may consider when deciding whether inmates should be double-celled.  (*Id.*)

17.      Per departmental policy, inmates must be housed in the first-available and appropriate bed, consistent with their IHC.  (*Id.*)

18.      Plaintiff first arrived at COR on September 2, 2017, at approximately 4:53 p.m., from Richard J. Donovan Correctional Facility.  (*Id.* ¶ 12, Ex. B; SAC at 5, ¶ 11.)

19.      No housing review was conducted at that time because Plaintiff was transferred to California Health Care Facility just a few hours later, for placement on a Mental Health Crisis Bed.  (Sanchez Decl. ¶ 13, Ex. B.)

20.      Plaintiff returned to COR on October 19, 2017, around 7:20 p.m.  (*Id.* ¶ 14; SAC at 5, ¶ 13.)

21.     Upon Plaintiff's return, Sgt. Garza performed an Initial Housing Review. (Sanchez Decl. ¶ 14, Ex. C.)

22.     Among other things, Sgt. Garza reviewed Plaintiff's known enemies.  (*Id.*)

23.     For purposes of his housing assignment, Plaintiff was deemed "Racially Eligible." (*Id.*)

24.     After the Initial Housing Review was performed, Plaintiff was housed in Cell 118, located inside Housing Unit 3, on Facility C.  (*Id.* ¶ 15, Ex. D.)

25.     That unit housed Sensitive Needs Yard (SNY) inmates receiving mental health care services at the Enhanced Out Patient (EOP) level of care.  (*Id.* ¶ 15.)

26.     While Plaintiff was housed in Cell 118, he had the following cellmates:

     a.  Inmate D. Rodgers from October 19–21, 2017;

     b.  No cellmate (vacant cell) from October 21–November 7, 2017;

     c.  Inmate T. Hall on November 9, 2017;[3]

     d.  No cellmate (vacant cell) from November 9–16, 2017;

     e.  Inmate J. Michaels from November 16–22, 2017;

     f.  No cellmate (vacant cell) from November 22–December 11, 2017; and

     g.  Inmate R. Brown from December 11, 2017–January 19, 2018.

     (*Id.* ¶ 16, Ex. E.)

27.     Plaintiff continued to have other cellmates even after he was moved to another cell in the same housing until, through March 2018.  (*Id.*)

Plaintiff's Case Factors

28.     Since 2005, Plaintiff has been serving a life sentence with the possibility of parole for sex-related crimes committed in 1997 and 2003, including battery with serious injury, rape with force/violence, oral copulation with force/violence, sodomy with the use of a firearm, and being a felon in possession of a firearm.  (*Id.* ¶ 17.)

///

---

[3] Exhibit E shows that inmate Hall was housed with Plaintiff on November 7, 2017.  (Sanchez Decl., Ex. E.) Defendants contend that this is a clerical error, and inmate Hall was housed with Plaintiff only on November 9, 2017. (*See* Sanchez Decl. ¶¶ 28–29, Ex. G.)

29.     Since 2016, Plaintiff was found guilty of several disciplinary violations, including behavior that could lead to violence, theft of State property, indecent exposure, two instances of fighting, disrespect, failure to meet program/work expectations, and unauthorized possession of medication.  (*Id.*)

30.     In February 2016, Plaintiff participated in a riot at Salinas Valley State Prison. (*Id.*)

31.     Plaintiff has an older history of aggression stemming from two instances of mutual combat in April 2010 and September 2012, and a history of in-cell assault from an incident in October 2009.  (*Id.*)

32.     Plaintiff does not have any known gang affiliations.  (*Id.*)

Inmate Hall's Case Factors

33.     Since 2014, inmate Hall has been serving an eleven-year sentence for attempted second-degree murder.  (*Id.* ¶ 18.)

34.     Since 2016, inmate Hall was found guilty of two instances of fighting, sexual disorderly conduct, refusing to provide urine sample for testing, threats, behavior that encourages illegal sexual acts, damages of State property, and sixteen instances of indecent exposure.  (*Id.*)

35.     Inmate Hall is a self-admitted Blood.  (*Id.*)

36.     Inmate Hall first arrived at COR in February 2017.  (*Id.*)

37.     Before November 9, 2017, inmate Hall did not receive a Rules Violation Report for fighting other inmates at COR.  (*Id.*)

38.     At a UCC held on November 7, 2017, the committee members considered inmate Hall's case factors and noted that he "[did] not have a significant history of in-cell predatory/assaultive behavior towards cellmates."  (*Id.*)

39.     Before being housed with Plaintiff, inmate Hall was deemed "Racially Eligible" for housing and cleared for double-celling.  (*Id.*)

40.     Similar to Plaintiff, inmate Hall was an EOP, SNY inmate during the time relevant to the allegations in this lawsuit.  (*Id.*)

///

41.     Nothing in inmate Hall's case factors indicate that he had a pattern of assaultive behavior; specifically, nothing indicate that he had a habit of assaulting other inmates with medication plastic cups.  (*Id.*)

### The Role of UCCs and the UCC on November 2, 2017

42.     UCCs are held periodically for inmates, whether inmates arrive into CDCR custody for the first time, as new arrivals at a specific institution, or for annual reviews.  (*Id.* ¶ 19.)

43.     Committees meet to evaluate an inmate's case factors, including score, custody, and medical and mental health needs.  (*Id.*)

44.     UCCs are tasked with performing comprehensive evaluations of an inmate to ensure appropriate housing and placement.  (*Id.*)

45.     UCCs are typically comprised of Correctional Counselors, medical, mental health, and education representatives (if warranted), and a Chairperson.  (*Id.*)

46.     As the senior custody officer, the Chairperson consults with the other UCC members, considers any relevant recommendations, and ultimately makes a determination regarding an inmate's classification.  (*Id.*)

47.     On November 2, 2017, Defendant Sanchez chaired Plaintiff's initial UCC with two other committee members, Counselors C. Hernandez and R. Celestin.  Present during the committee were also Dr. Crisanto, representing mental health, and T. Hibbard, representing education.  (*Id.* ¶ 20, Ex. F.)

48.     After considering all of Plaintiff's relevant case factors, taking into account the committee members' recommendations, and hearing Plaintiff's input, the UCC decided to continue Plaintiff's double-cell status.  (*Id.* ¶ 21, Ex. F.)

49.     This was based, in part, on Plaintiff's lack of significant in-cell predatory or assaultive behavior toward inmates.  (*Id.*)

50.     Plaintiff disagreed with the UCC's decision regarding his double-cell status.  (*Id.* ¶ 22.)

///

9

51.     Plaintiff claimed to have been previously approved for single-cell status, which he had hoped the UCC would continue.  (*Id.*)

52.     The UCC could not verify Plaintiff's claim of single-cell status; indeed, Plaintiff did not have single-cell status.  (*Id.*)

53.     Plaintiff did not qualify for single-cell status based on his case factors.  (*Id.*)

54.     During the UCC, Plaintiff did not express any safety concerns about being double-celled with inmate Hall, or being double-celled, generally.  (*Id.* ¶ 23.)

55.     Had he mentioned any safety concerns, his comments would have been recorded in the "Inmate Comments" section of the UCC note, just as his disagreement with being double-celled was recorded.  (*Id.* ¶ 23, Ex. F.)

56.     A review of Plaintiff's prison records shows no evidence that he expressed any such concerns to Defendant Sanchez or other staff members on or about the time relevant to the allegations in this lawsuit (*i.e.*: October–November, 2017).  (*Id.* ¶ 23.)

57.     Had Plaintiff expressed any safety concerns, he would have been referred to a mental health clinician for further discussion, or the UCC would have addressed his safety concerns, or both.  (*Id.* ¶ 24.)

58.     CDCR staff are trained to take inmate safety concerns very seriously and investigate them to determine if they are substantiated.  (*Id.*)

59.     In circumstances where credible safety concerns are not considered or properly investigated, inmates or staff members can become the target of assaults.  (*Id.*)

60.     When Defendant Sanchez chaired the UCC on November 2, 2017, she specifically weighed Plaintiff's case factors—not the case factors of other inmates—since Plaintiff was the subject of the UCC.  (*Id.* ¶ 25.)

61.     In doing so, Defendant Sanchez reviewed Plaintiff's medical, mental health, disciplinary, and victimization factors.  (*Id.*)

62.     Inmates who have documented victimization concerns (*e.g.*: victims of sexual assaults by other inmates), or inmates who have documented assaultive or predatory behavior, may be cleared for single-cell status.  (*Id.*)

63.     However, those circumstances did not apply to Plaintiff.  (*Id.*)

64.     When reviewing any inmate's case factors, UCCs consider not just isolated instances of fighting or assaultive behavior.  (*Id.* ¶ 26.)

65.     Several fights—even if recent in time—may not, in and of themselves, be sufficient to grant an inmate's request for single-cell status.  (*Id.*)

66.     Instead, UCCs consider patterns of behavior, based on a review of overall conduct on a two-year or five-year basis, or as needed based on the total duration of an inmate's incarceration.  (*Id.*)

67.     At the time of the UCC on November 2, 2017, Plaintiff's most recent fight dated back to 2012.  (*Id.* ¶ 27.)

68.     Given the infrequency of Plaintiff's fights, Defendant Sanchez considered those fights to be isolated incidents that were ultimately insufficient to amount to predatory behavior or a pattern of behavior.  (*Id.*)

69.     With respect to victimization, there was no evidence that Plaintiff would victimize others.  (*Id.*)

70.     There was also no evidence of a risk that others would victimize Plaintiff.  (*Id.*)

71.     Plaintiff was forty-seven years old at the time of the UCC and in good physical shape.  (*Id.*)

72.     Plaintiff's age and overall fitness level indicated to Defendant Sanchez that he was not susceptible to in-cell victimization or abuse.  (*Id.*)

73.     Further, Plaintiff's demeanor during the interview did not alert Defendant Sanchez that he was aggressive or violent.  (*Id.*)

74.     Although Defendant Sanchez continued Plaintiff's double-cell status at the UCC on November 2, 2017, she was not involved in housing inmate Hall with Plaintiff, or any other inmates with Plaintiff.  (*Id.* ¶ 28, Ex. G.)

75.     Housing assignments are the responsibility of custody staff in each housing unit and each facility at the prison, based on bed availability, compatibility, and, where possible, inmate requests.  (*Id.* ¶ 28.)

11

76.   Defendant Hicks requested inmate Hall's bed transfer on November 9, 2017, and Officer J. Jones moved inmate Hall into Plaintiff's cell that day.  (*Id.* ¶ 29, Ex. G.)

77.   In reviewing both inmates' case factors for the purposes of this litigation, Defendant Sanchez found no reason to doubt that they were compatible for double-celling.  (*Id.* ¶ 30.)

78.   Nothing about their individual case factors would have alerted staff members that a fight between the two would ensue, inside their cell or elsewhere.  (*Id.*)

79.   Based on the factors that would have been available to the staff members requesting and performing the double-cell assignment on November 9, 2017, there was no clear risk of harm to either inmate's safety.  (*Id.*)

80.   Nor was there any indication that Plaintiff and inmate Hall could not safely house together.  (*Id.*)

81.   COR is a Level IV, maximum-security prison, meaning the vast majority of inmates housed there are serving sentences for violent offenses.  (*Id.* ¶ 31.)

82.   It would be impossible to single-cell each inmate due to physical constraints in the architectural design and capacity of the institution.  (*Id.*)

83.   Although staff members strive to make well-informed and accurate housing determinations, they cannot account for every possible conflict that can arise among inmates at any time, particularly in a Level IV institution.  (*Id.*)

84.   The difficulty in foreseeing every possible conflict that could arise between inmates is greater in the inmate population who receives specialized mental health treatment at the EOP level of care.  (*Id.* ¶ 32.)

85.   The inmates' mental illnesses means that their behavior is sometimes unpredictable, which underscores the importance of inmates apprising custody staff of any housing issues as they arise.  (*Id.*)

86.   During orientation, inmates are instructed to seek staff assistance for housing and other custody-related issues.  (*Id.*)

///

12

87.     Despite this, inmates often take it upon themselves to resolve housing-related issues without staff assistance for fear of being labeled "snitches." (*Id.*)

88.     In the event two inmates are not compatible after being housed together, custody staff perform weekly convenience moves. (*Id.* ¶ 33.)

89.     Inmates are routinely advised of this and may request such moves. (*Id.*)

90.     Inmates always have the option to refuse a specific housing assignment, even if disciplinary restrictions may be applied for refusing. (*Id.*)

91.     Plaintiff could have, but did not, refuse the housing assignment with inmate Hall on November 9, 2017. (*Id.*)

92.     There is no indication, based on Plaintiff's prison records, that he alerted any staff members about potential incompatibility or other issues with inmate Hall. (*Id.*)

The Fight Between Plaintiff and Inmate Hall, and Its Aftermath

93.     On November 9, 2017, at approximately 8:00 p.m., Plaintiff and inmate Hall were involved in a physical altercation during the late evening medication pass, which was conducted inside Housing Unit 3, on Facility C. (*Id.* ¶ 34, Ex. H; ECF No. 95 (Pl.'s Opp'n), p. 2.)

94.     Based on their involvement in that incident, both Plaintiff and inmate Hall received Rules Violation Reports for fighting, and both were found guilty of the charges. (Sanchez Decl. ¶ 34.)

95.     The fact that inmate Hall may have used a plastic cup during the fight—which is not documented in the incident packet—is not in and of itself unusual because nurses regularly use plastic cups to dispense pills to inmates in the medication line. (*Id.*)

96.     Following the incident, per standard procedure, Sgt. Molina interviewed both inmates to ascertain whether they considered themselves enemies and if they could continue to program together on the same yard/facility. (*Id.* ¶ 35, Ex. I.)

97.     When interviewed, both inmates stated that a personal problem between them led to the fight. (*Id.* ¶ 36, Ex. I.)

98.     The two inmates did not consider themselves enemies, stated they could continue to program together, and signed a Compatibility Chrono as documentation of their agreement.

1    (*Id.*)

2    99.    After the incident, Plaintiff was seen in the Triage and Treatment Area.  (ECF No.

3    92-3 (Severns Decl.) ¶ 10, Ex. B; Sanchez Decl. Ex. H.)

4    100.    Plaintiff was diagnosed with right orbital mild swelling, mild bruising, and a

5    puncture wound on his lip.  (Severns Decl. ¶ 11, Ex. B; Sanchez Decl. Ex. H.)

6    101.    There was no need for laceration repair.  (Severns Decl. ¶ 11, Ex. B.)

7    102.    Plaintiff was advised to go to an outside hospital for imaging studies, X-ray, and

8    CT scan, but denied further treatment and signed an Against Medical Advice form.  (*Id.*)

9    103.    Plaintiff was given pain medications and an ice pack.  (*Id.*)

10    104.    On November 21, 2017, X-rays of Plaintiff's facial bones were taken.  (*Id.* ¶ 12,

11    Ex. C.)

12    105.    The X-rays revealed no bone fractures or acute osseous injuries.  (*Id.* ¶ 13, Ex. C.)

13    <u>Interdisciplinary Treatment Team (IDTT) Meeting on November 1, 2017</u>

14    106.    A review of Plaintiff's mental health records demonstrates that only one IDTT

15    meeting was held for Plaintiff—on November 1, 2017.  (*Id.* ¶¶ 4–5, Ex. A.)

16    107.    The IDTT was attended by LCSW R. Severns, Correctional Counsel R. Celestin,

17    Dr. G. McGowan, and Supervising Psychologist R. Oropeza.  (*Id.* ¶ 6, Ex. A.)

18    108.    During the IDTT, Plaintiff reported that his medications were working well,

19    without side effects.  (*Id.* ¶ 7, Ex. A.)

20    109.    Plaintiff reported no suicidal or homicidal ideation, no auditory hallucinations, and

21    no safety concerns with other inmates or staff members.  (*Id.*)

22    110.    The decision of the IDTT was to retain Plaintiff at the EOP level of care.  (*Id.* ¶ 8,

23    Ex. A.)

24    111.    No other IDTTs were held during the month of November 2017; specifically, no

25    IDTTs were held on November 2 or 3, 2017.  (*Id.* ¶ 9.)

26    ///

27    ///

28    ///

1    **B.     Analysis**

2        **1.     Failure to Exhaust Administrative Remedies**

3        Defendants' prior motion for summary judgment based on Plaintiff's failure to exhaust

4    administrative remedies was granted in part and denied in part, (ECF Nos. 81, 87), and the only

5    remaining issue with respect to exhaustion is which Defendants, if any, were "members of the

6    ICC and IDTT committees on November 2, 2017 or November 3, 2017."  (ECF No. 81, p. 19.)

7        Defendants provide evidence that of the named Defendants, only Defendant Sanchez was

8    a member of the Unit Classification Committee (UCC) on November 2, 2017.[4]  UMF 47.

9    Defendants therefore contend that Defendants Hicks, Amaya, Alcantar, McIntyre, and Baylon be

10   dismissed due to Plaintiff's failure to exhaust his administrative remedies with respect to any

11   claims against them.  Plaintiff does not dispute this fact, and instead claims that he amended his

12   complaint to include committee members Celestin and Crisanto, and raises arguments related to

13   the unavailability of his administrative remedies.

14       As discussed above, Plaintiff previously attempted to file an amended complaint to

15   include additional defendants, but failed to file a proposed amended complaint or explain why an

16   amendment should be permitted at this late stage in the case.  (*See* ECF No. 94.)  Plaintiff did not

17   take the opportunity to file a proposed amended complaint, and therefore the action proceeds only

18   as against Defendants Hicks, Amaya, Alcantar, McIntyre, Baylon, and Sanchez on Plaintiff's

19   claim of failure to protect, and only to the extent these Defendants were members of the relevant

20   UCC or IDTT.  Celestin and Crisanto, or any other individuals named in Plaintiff's briefing, are

21   therefore not parties to this action.

22       All exhaustion-related issues unrelated to the identities of the UCC and IDTT members,

23   including whether administrative remedies were available to Plaintiff, should have been raised in

24   briefing on the prior motion, and cannot be raised at this late date.  (ECF No. 81, p. 19; adopted in

25   full by ECF No. 87.)  In light of Plaintiff's failure to raise any genuine dispute of fact as to the

26   membership of the November 2, 2017 UCC, including any allegation that he was prevented from

27

28   _____
     [4] Defendants clarify that although Plaintiff wrote "ICC" in his grievance, he likely meant "UCC."  (ECF No. 92, p. 21, n.6.)  For the purposes of this motion, the Court finds that ICC and UCC may be used interchangeably.

1   learning the names of the appropriate committee members at an earlier date such that they could

2   be included in Plaintiff's administrative grievances, the Court finds that Defendants Hicks,

3   Amaya, Alcantar, McIntyre, and Baylon should be dismissed based on Plaintiff's failure to

4   exhaust his administrative remedies.  The Court therefore considers only Plaintiff's failure to train

5   claim against Defendant Sanchez on the merits.

6                                    **2.       Failure to Protect**

7           Prison officials have a duty under the Eighth Amendment to protect prisoners from

8   violence at the hands of other prisoners or others because being violently assaulted in prison is

9   simply not part of the penalty that criminal offenders pay for their offenses against society.

10  *Farmer*, 511 U.S. at 833; *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir.2009); *Hearns v.*

11  *Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).  However, prison officials are liable under the

12  Eighth Amendment only if they demonstrate deliberate indifference to conditions posing a

13  substantial risk of serious harm to an inmate; and it is well settled that deliberate indifference

14  occurs when an official acted or failed to act despite his knowledge of a substantial risk of serious

15  harm.  *Farmer*, 511 U.S. at 834, 841; *Clem*, 566 F.3d at 1181; *Hearns*, 413 F.3d at 1040.  A

16  housing assignment may be "restrictive and even harsh," but will not violate the Eighth

17  Amendment unless it "either inflicts unnecessary or wanton pain or is grossly disproportionate to

18  the severity of crimes warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 348–49

19  (1981) (finding inmates had no constitutional right to be housed in single cells).  Only where

20  prison officials knew that a housing assignment posed an excessive risk to an inmate's safety will

21  placement with a particular inmate have constitutional implications.  *Estate of Ford v. Ramirez–*

22  *Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002).

23                                    a.       Defendant Sanchez

24          Defendants contend that Defendant Sanchez was not deliberately indifferent to a serious

25  threat to Plaintiff's safety during the ICC on November 2, 2017, was not involved in double-

26  celling Plaintiff and inmate Hall or the ensuing fight between them, and the undisputed evidence

27  shows that Plaintiff and inmate Hall were compatible and appropriately housed together.  In

28  opposition, Plaintiff raises a novel argument regarding supervisory liability, attempts to join

                                                    16

Warden Ken Clark as an additional defendant, and asserts that Defendant Sanchez (and Warden Clark) were informed by Plaintiff of his safety concerns and failed to take any action to investigate their veracity or prevent harm to Plaintiff.  Plaintiff also appears to advance claims regarding retaliation and violations of the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA).

Plaintiff's retaliation claims were dismissed for failure to exhaust his administrative remedies, (ECF No. 87), and Plaintiff has provided no basis for reinstating them in this action. With respect to Plaintiff's attempts to bring claims against Warden Clark or under the ADA and RA, Plaintiff may not join new defendants or add new claims at this late stage.  Plaintiff's attempt to hold Defendant Sanchez liable under a theory supervisory liability, or *respondeat superior*, is also unnecessary and inapplicable.  Plaintiff is already proceeding on a claim of failure to protect against Defendant Sanchez in her individual capacity, and to the extent Plaintiff is attempting to hold Defendant Sanchez responsible for the actions of her subordinates, he may not do so. *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1020–21 (9th Cir. 2010).

Based on the undisputed facts, the Court finds that at the time of the November 2, 2017 UCC, Defendant Sanchez was unaware of any particular risk to Plaintiff of being double-celled, or of being housed with inmate Hall in particular.  Defendant Sanchez weighed Plaintiff's case factors, including medical, mental health, disciplinary, and victimization factors.  UMF 60, 61. Defendant Sanchez found that Plaintiff did not meet any of the circumstances warranting single cell status, and Plaintiff's age and overall fitness level indicated that he was not susceptible to in-cell victimization or abuse.  UMF 62, 63, 72.  During the UCC, Plaintiff expressed disagreement with the decision to continue his double-cell status, claiming prior approval for single-cell status that the committee was unable to verify.  UMF 50–52.

In contrast, Plaintiff claims in his opposition, signed under penalty of perjury, that during the UCC he informed the committee members of his fears of being set up by CSP-Corcoran-3B-Facility officials for being an active participant in several civil actions against CDCR officials. (ECF No. 95, p. 5 ¶ 14 ("On November 2, 2017, Defendant Sanchez and other newly discovered Defendants of the UCC/IDTT members were informed by plaintiff of his fears of being set up by

1   CSP-COR-3B-Facility officials for being an active participant in several civil actions against

2   CDCR officials.")  However, the evidence submitted by Defendants of the November 2, 2017

3   UCC states that while Plaintiff participated in the committee, his only comments related to his

4   disagreement regarding his double cell status, and his unverified claim to prior single cell status.

5   UMF 50–52; *compare* ECF No. 95 p. 36 ¶ 13 ("Defendants or CDCR UCC or ICC committee

6   never document inmates' actual statements in the inmate comments section of the UCC notes.");

7   ¶14 ("CDCR will do everything in its power to cover up its misconduct.")  Plaintiff's conclusory

8   allegations and speculation, though signed under penalty of perjury, are insufficient to create a

9   dispute of fact.  *See Rivera v. AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory

10  allegations unsupported by factual data cannot defeat summary judgment."); *F.T.C. Publ'g*

11  *Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) *as amended* (Apr. 11, 1997) ("A

12  conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is

13  insufficient to create a genuine issue of material fact.").

14          Plaintiff further alleges that Defendant Sanchez acknowledged her awareness of a threat

15  posed to Plaintiff during the UCC hearing and in his CDCR 128-B Chrono dated November 2,

16  2017, but despite this knowledge, Defendant Sanchez and the UCC members ignored the risk

17  factors and failed to intervene to safeguard Plaintiff.  (*Id.* ¶ 16.)  Plaintiff does not provide a copy

18  of a November 2, 2017 128-B Chrono, but Defendants provided a November 9, 2017 128-B

19  Chrono, signed by Plaintiff, inmate Hall, and Correctional Sergeant E. Molina at Exhibit I to the

20  Sanchez Declaration.  (ECF No. 92-4, p. 59.)  That document provides that on November 9, 2017,

21  inmate Hall and Plaintiff were involved in a fight in the 3B02 B Section Dayroom, both inmates

22  stated that the incident stemmed from a personal problem which resulted in a physical altercation

23  with each other, and both inmates stated they "DO NOT consider each other to be enemies and

24  CAN continue to program on the same Yard/Facility."  (*Id.*)  In addition, the CDCR 7219

25  (Medical Report of Injury or Unusual Occurrence) completed for Plaintiff on November 9, 2017

26  following the altercation with inmate Hall includes only the following comment from Plaintiff, "I

27  walked out my cell to get my meds."  (*Id.*, p. 56.)

28          Aside from Plaintiff's statements in his opposition brief, he has included Exhibits A–D in

18

1   support of his arguments.  However, a review of these documents reveals that all documents post-

2   date the November 9, 2017 altercation with inmate Hall, as well as the November 2, 2017 UCC

3   hearing, and many appear wholly unrelated to the claims at issue in this action.  As such, they

4   cannot provide support for Plaintiff's argument that Defendant Sanchez was aware of any risk of

5   harm to Plaintiff before the UCC hearing, or before the November 9, 2017 incident with inmate

6   Hall, such that she failed to protect Plaintiff from an assault from inmate Hall or any other

7   cellmate.  Without such evidentiary support, Plaintiff has presented, at most, his own declaration

8   in support of the argument that Defendant Sanchez was aware of a specific risk of harm to

9   Plaintiff from celling with inmate Hall, at the time of the UCC hearing.  Again, this is insufficient

10  to raise a genuine dispute of fact.  *Rivera*, 331 F.3d at 1078; *Publ'g Clearing House, Inc.*, 104

11  F.3d at 1171.  The Court therefore concludes that there is no genuine issue of material fact

12  preventing summary judgment in favor of Defendant Sanchez.

b.      Defendant Severns and November 1, 2017 IDTT

14          Defendant Severns was dismissed from this action following Defendants' motion for

15  summary judgment for failure to exhaust administrative remedies.  (ECF No. 87.)  However, in

16  light of Defendants' confirmation that Defendant Severns was a member of the November 1,

17  2017 IDTT, the Court finds it appropriate to evaluate any potential remaining claims against

18  Defendant Severns.

19          While screening the second amended complaint, the Court originally found that while

20  Plaintiff stated a First Amendment retaliation claim against Defendant Severns—which was not

21  administratively exhausted and is therefore not at issue here—the Court found that there was no

22  cognizable failure to protect claim because Plaintiff did not allege that Defendant Severns knew

23  of a serious risk of harm from inmate Hall specifically.  (*See* ECF No. 37, p. 11.)  While this

24  remains true, Plaintiff has now presented evidence that Defendant Severns may have been aware

25  of Plaintiff's generalized fears.  Specifically, on January 4, 2018, Plaintiff submitted a CDCR

26  Form 22 to the 3B-Mental Health Clinician Office requesting to document that on November 2,

27  2017, CSP-Corcoran's 3B-EOP IDTT Treatment Team members were notified of Plaintiff's fears

28  of cell mates being placed into his cell to carry out assaults, prompting Plaintiff to request single

19

cell status.  (ECF No. 95, p. 59.)  Defendant Severns provided the staff response on January 5, 2018, stating "Mr. Ardds does not meet criteria for single cell chrono due to mental health reasons, per memorandum from CSP COR Chief of Mental Health dated 9/22/11." (*Id.*)

In contrast, Defendant Severns states that during the IDTT, Plaintiff reported no safety concerns with other inmates or staff members.  UMF 109.  In addition, the November 1, 2017 IDTT note attached to the Severns Declaration notes Plaintiff's pending litigation against CDCR members for "mistreatment and harrassment [sic]," and Plaintiff's concerns regarding "harrassment [sic] by staff," there are no comments noting concerns about assaults from cellmates.  (ECF No. 92-3, p. 10.)

Even taking as true Plaintiff's assertions that he notified Defendant Severns during the November 1, 2017 IDTT meeting regarding his fears of cellmates being placed into his cell to carry out assaults, and that he requested single cell status at that time, this is insufficient to proceed on a claim of failure to protect against Defendant Severns.  As discussed above, Plaintiff's generalized fears of assault by any future cellmate, such that single cell housing was necessary to avoid harm, are insufficient to state a cognizable claim.  *Estate of Ford*, 301 F.3d 1050.  Plaintiff has not alleged, much less demonstrated by undisputed evidence, that Defendant Severns was aware of any specific risk of harm from Plaintiff being housed with inmate Hall, much less that Defendant Severns was aware Plaintiff would be housed with inmate Hall.  Accordingly, the Court finds that Plaintiff also cannot proceed on any claims against Defendant Severns.

### 3.   Qualified Immunity

Defendants also assert that the Court should grant summary judgment on the basis of qualified immunity.  However, the Court finds that this argument need not be reached, based upon the above determination regarding the undisputed facts in this case.

## V.   Conclusion and Recommendations

For the reasons explained above, the Court finds that Defendants are entitled to summary judgment.

Accordingly, IT IS HEREBY RECOMMENDED as follows:

1.  Defendants' motion for summary judgment, (ECF No. 92), be GRANTED;

2.  Plaintiff's Eighth Amendment claim against Defendants Hicks, Amaya, Alcantar, McIntyre, and Baylon for failure to protect Plaintiff from an alleged assault by inmate Hall on November 9, 2017, be DISMISSED, without prejudice, for failure to exhaust administrative remedies;

3.  Plaintiff's Eighth Amendment claim against Defendant Sanchez for failure to protect Plaintiff from an alleged assault by inmate Hall on November 9, 2017, be DISMISSED, with prejudice; and

4.  The Clerk of the Court be directed to close this case.

* * *

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 7, 2023**                    /s/ *Barbara A. McAuliffe*
                                              UNITED STATES MAGISTRATE JUDGE